Opinion for the Court filed by Circuit Judge WILKINS. Opinion concurring in the judgment filed by Circuit Judge HENDERSON. Concurring opinion filed by Circuit Judge MILLETT.
WILKINS, Circuit Judge:
Margaret Sowerwine and Jane Foran, individual consumers of poultry, and Food & Water Watch, Inc. (“FWW”), their organizational advocate, fear that new regulations promulgated by the United States Department of Agriculture (“USDA”) may result in an increase in foodborne illness from contaminated poultry. To prevent the regulations from going into effect, Plaintiffs sought declaratory and injunctive relief. The District Court concluded that Plaintiffs failed to demonstrate an injury in fact and dismissed Plaintiffs’ claims for lack of standing.
On appeal, Plaintiffs argue that the District Court applied an incorrect standard in finding that they lacked standing. According to Plaintiffs, once the appropriate standard is applied, their complaint and evidence show: (1) the Individual Plaintiffs, Margaret Sowerwine and Jane For-an, and FWW members have shown an increase in the -risk of harm sufficient to establish an injury in fact; (2) FWW has shown an injury to its interest and expenditures made in response to that injury sufficient to establish an injury in fact; and (3) Plaintiffs have suffered a procedural injury sufficient to establish an injury in fact for purposes of standing. Although the District Court applied the incorrect standard to evaluate Plaintiffs’ standing, the District Court nonetheless correctly ruled that Plaintiffs have not alleged a sufficient injury to establish standing under the appropriate standard. Accordingly, we affirm.
I.
The Poultry Products Inspection Act (“PPIA”), 21 U.S.C. §§ 451^472, was born out of a Congressional interest in protecting consumer health and welfare by enabling the Secretary of Agriculture (“Secretary”) to ensure that poultry products were “wholesome, not adulterated, and properly marked, labeled, and packaged.” 21 U.S.C. § 451. The PPIA accomplishes this goal, in part, by requiring the Secre *910 tary to ensure that inspectors[1] conduct a post-mortem inspection of all poultry processed for human consumption. Id. § 455(b). The PPIA also requires condemnation and destruction for human food purposes of all poultry that is found to be adulterated, unless the poultry can be reprocessed under an inspector’s supervision so that it is found to be not adulterated. Id. § 455(c). The PPIA defines “adulterated” to include various conditions, including containing, among other things, “any poisonous or deleterious substance which may render it injurious to health”; various additives that are unfit for human consumption; consisting in whole or in part of any “filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food”; or packaging in conditions where it “may have been rendered injurious to health.” Id. § 453(g). Carcasses that pass inspection receive an official legend indicating that it was inspected by the USDA. Id. § 45300(12); 9 C.F.R. § 381.96.
The Food Safety and Inspection Service (“FSIS”) administers the PPIA. See 7 C.F.R. §§ 2.18(a)(l)(ii)(A), 2.53(a)(2)®. Historically, FSIS has permitted chicken and turkey — the poultry products of concern to Plaintiffs — to be inspected under one of four inspection systems: the Streamlined Inspection System, the New Line Speed Inspection System, the New Turkey Inspection System, and traditional inspection (collectively, “the existing inspection systems”). Modernization of Poultry Slaughter Inspection, 77 Fed.Reg. 4408, 4410 (proposed Jan. 27, 2012). Under the existing inspection systems, FSIS inspectors perform either an online or offline role. See id. Offline inspectors ensure compliance with food safety regulations, verify sanitation procedures, and collect samples for pathogen testing. See id. One or more online FSIS inspectors inspect each poultry carcass- with its viscera [2] immediately following the separation of the viscera from the carcass. See id. Under the existing inspection systems, the inspectors conduct an “organoleptic” inspection, using sight, touch, and smell to evaluate the carcasses. See Brief for Appellees, Food & Water Watch, Inc. v. Vilsack, No. 15-5037 (D.C.Cir.), Doc. No. 1553589, at 3; see also 77 Fed.Reg. at 4410 (noting that inspectors “examine each eviscerated carcass for visual defects”). Poultry establishment personnel do not conduct any sorting or evaluation of carcasses; the poultry establishments provide a “helper” who takes action only upon an FSIS inspector’s direction. 77 Fed.Reg. at 4410.
The inspection method at issue in this case, the New Poultry Inspection System (“NPIS”), alters the responsibilities of the FSIS inspectors and the establishment personnel. The NPIS rules institutionalize the shift from inspector-based sorting and evaluation to establishment-based sorting and evaluation. Under the NPIS, poultry establishment personnel sort the poultry carcasses and take corrective action prior to an FSIS inspection. See id. at 4421.
*911 The NPIS grew out of FSIS’s concern that agency resources were not being used in the most effective way to ensure food safety. See id. at 4410. In an effort to develop new methods to more effectively inspect poultry, in 1996 FSIS promulgated the “Pathogen Reduction/Hazard Analysis and Critical Control Points” (“HACCP”) rule. Id. at 4413; Pathogen Reduction; Hazard Analysis and Critical Control Points, 61 Fed.Reg. 38806 (July 25, 1996). HACCP required poultry establishments to develop controls to ensure product safety and empowered the establishments to make their own determinations about how to meet the FSIS regulatory requirements. 77 Fed.Reg. at 4413. FSIS subsequently announced an HACCP-based inspection models project (“HIMP”) that would allow FSIS to test and develop new inspection models. HACCP-Based Meat and Poultry Inspection Concepts, 62 Fed.Reg. 31553 (June 10, 1997). The pilot HIMP method made poultry establishment personnel “responsible for identifying and removing normal from abnormal carcasses and parts.” 77 Fed.Reg. at 4413.
The HIMP pilot was challenged as a violation of the PPIA because FSIS inspectors did not inspect poultry carcasses themselves, leaving all inspection to establishment personnel with FSIS oversight. Am. Fed’n of Gov’t Empls., AFL-CIO v. Glickman (AFGE I), 215 F.3d 7, 9-10 (D.C.Cir.2000). This Court held that such delegation violated the PPIA. Id. at 11. In response to AFGE I, “FSIS modified HIMP to position one inspector at a fixed location near the end of the slaughter line in each poultry slaughter establishment” who was responsible for evaluating each carcass after establishment personnel had sorted and processed it. 77 Fed.Reg. at 4413. The modified HIMP program was also challenged, and this Court held that the program did not violate the PPIA. Am. Fed’n of Gov’t Empls., AFL-CIO v. Vene-man, 284 F.3d 125, 130-31 (D.C.Cir.2002). However, we cautioned that “[i]f the USDA undertakes a rulemaking to adopt as a permanent change something along the lines of the modified program, experience with the program’s operation and its effectiveness will doubtless play a significant role” and warned that our opinion “may not necessarily foreshadow the outcome of judicial review of such future regulations.” Id. at 130-31.
Twenty young chicken and five turkey establishments participated in HIMP, and FSIS collected and analyzed the data from these establishments. 77 Fed.Reg. at 4414. Using this data, FSIS concluded that the HIMP procedures “improved performance related to food safety and nonfood-safety standards ... especially in reducing pathogen levels” and proposed the NPIS to replace the existing inspection systems, excluding the traditional inspection system. Id. at 4421., Under the proposed NPIS rule, “establishments [would] be required to sort carcasses, to dispose of carcasses that must be condemned, and to conduct any necessary trimming or reprocessing activities before carcasses are presented to the online FSIS carcass inspector.” Id. The carcasses would pass along a production line for the online inspector at a speed of 175 birds per minute for young chickens, and 55 birds per minute for turkeys. Id. at 4423. While establishment personnel sort carcasses, FSIS inspectors would reallocate their time by increasing offline inspection activities. Id. at 4420, 4422. FSIS projected that 99.9% of young chickens and poultry would be produced under the NPIS. Id. at 4436. After a notice and comment period, FSIS adopted a final NPIS rule with a number of modifications, which included making adoption of the NPIS optional, and lowering the birds per minute speed of young chickens to 140 birds per minute. Modernization of Poul *912 try Slaughter Inspection, 79 Fed.Reg.. 49566, 49570 (Aug. 21, 2014).
On September 11, 2014, Plaintiffs filed their complaint in this case, claiming that the NPIS constitutes “an unprecedented elimination of inspection resources for a secret set of young chicken and turkey slaughterhouses.” Compl. ¶ 1, J.A. 9. In this spirit, Plaintiffs alleged eight claims against Defendants: (1) violation of 21 U.S.C. § 455(c) by allowing condemnation of young chicken and turkey carcasses by NPIS establishment personnel; (2) violation of 21 U.S.C. § 455(c) by allowing reprocessing of young chickens and turkeys by NPIS establishment personnel without inspector supervision; (3) violation of 21 U.S.C. § 455(b) because each young chicken and turkey carcass will not receive a post-mortem inspection in NPIS establishments; (4) violation of the PPIA’s branding requirements; (5) violation of 21 U.S.C. § 455(b) and 9 C.F.R. § 381.1 because each chicken and turkey viscera will not be federally inspected; (6) violation of 21 U.S.C. § 463(c) for failure to provide an opportunity for oral presentation of views; (7) violation of the Administrative Procedure Act (“APA”) by failing to provide adequate opportunity for notice and comment; and (8) violation of the APA because the final NPIS rules are arbitrary and capricious. Plaintiffs sought declaratory and injunctive relief. On the same day they filed the complaint, Plaintiffs moved for a preliminary injunction on Claims 1, 2, 6, and 7. The District Court heard the motion on October 17, 2014.
On February 9, 2015, the District Court dismissed the case for lack of subject matter jurisdiction because Plaintiffs lacked standing, and denied the motion for preliminary injunction and all other pending motions as moot. Food & Water Watch, Inc. v. Vilsack, 79 F.Supp.3d 174, 206 (D.D.C.2015). With respect to the Individual Plaintiffs, the District Court found that they did not suffer an injury in fact in order to establish standing. Id. at 190-95. The District Court also found that FWW lacked standing as an organization, and that Plaintiffs did not suffer a procedural injury sufficient to establish standing.[3] Id. at 199-206. Plaintiffs appeal the dismissal on these grounds.
II.
Before considering the merits of Plaintiffs’ standing arguments, we must first determine the appropriate standard under which we should evaluate Plaintiffs’ claims. Because Plaintiffs moved for a preliminary injunction, the District Court evaluated Plaintiffs’ standing to bring their claims under the heightened standard for evaluating a motion for summary judgment. See Food & Water Watch, 79 F.Supp.3d at 186 (citing Lujan v. Nat’l Wildlife Fed’n, 497 U.S. 871, 907 n. 8, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (Blackmun, J., dissenting)). This approach was correct for determining whether or not to grant the motion for preliminary injunction, but it was incorrect for determining whether to dismiss the case in its entirety.
It is well-established that “each element of Article III standing ‘must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.’ ” Bennett v. Spear, 520 U.S. 154, 167-68, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561, *913 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In order to obtain a preliminary injunction, a party must show, among other things, “a substantial likelihood of success on the merits.” Mills v. District of Columbia, 571 F.3d 1304, 1308 (D.C.Cir.2009) (internal quotation marks omitted). “In this context, the ‘merits’ on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction.” Obama v. Klayman, 800 F.3d 559, 565 (D.C.Cir.2015) (Williams, J.). In order to establish jurisdiction, a plaintiff must establish standing. .See, e.g., Susan B. Anthony List v. Driehaus, — U.S. -, 134 S.Ct. 2334, 2342, 189 L.Ed.2d 246 (2014) (“The party invoking federal jurisdiction bears the burden of establishing standing.” (citation and internal quotation marks omitted)). Accordingly, a party who seeks a preliminary injunction “must show a ‘substantial likelihood’ of standing.” Klayman, 800 F.3d at 568 (Williams, J.). A party who fails to show a “substantial likelihood” of standing is not entitled to a preliminary injunction. Id.
However, an inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction, not dismissal of the case. See id. at 562 (Brown, J.); id. at 568 (Williams, J.). Whether a party’s claim requires dismissal because of an inability to establish standing depends on the stage of the litigation. Bennett, 520 U.S. at 167-68, 117 S.Ct. 1154. Here, Plaintiffs filed their complaint and moved for a preliminary injunction contemporaneously. When the District Court dismissed the case, Defendants had not yet filed an answer, and no discovery had occurred. Accordingly, the litigation had not proceeded past the pleadings stage, and standing — for .evaluating the propriety of proceeding with the case at all — should have been evaluated under the motion to dismiss standard. Id. Because what we have before us is the dismissal' of Plaintiffs’ complaint, we must evaluate whether they have established standing under the standard applicable pursuant to Federal Rule of Civil Procedure 12(b)(1).
To establish standing, Plaintiffs “must state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits.” Humane Soc’y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C.Cir.2015). “[G]eneral factual allega: tions of injury resulting from the defendant’s conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.” Bennett, 520 U.S. at 168, 117 S.Ct. 1154 (internal quotation marks omitted). However, “we do not assume the truth of legal conclusions, nor do we accept inferences that are unsupported by the facts set out in the complaint.” Arpaio v. Obama, 797 F.3d 11, 19 (D.C.Cir.2015) (citations and internal quotation marks omitted). Furthermore, “ ‘[w]hen considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties).’ ” Id. at 21 (quoting United Transp. Union v. ICC, 891 F.2d 908, 913 (D.C.Cir.1989)). In determining standing, we may consider materials outside of the complaint. See Coal. for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C.Cir.2003).
Applying this standard, we review standing de novo. Equal Rights Ctr. v. Post Props., Inc., 633 F.3d 1136, 1138 (D.C.Cir.2011).
*914 III.
Plaintiffs first contend that the Individual Plaintiffs, Sowerwine and Foran, have alleged an injury in fact. Plaintiffs also submit that FWW would have associational standing on behalf of its members. See, e.g., Sierra Club v. EPA 754 F.3d 995, 999 (D.C.Cir.2014) (explaining that associational standing requires an organization to show, among other things, that “at least one of [the organization’s] members would have standing to sue”). Because the analyses for both the Individual Plaintiffs and FWW’s members are identical, see id., we address them jointly here.
For the Individual Plaintiffs or FWW’s individual members to establish standing, they must show (i) they have “suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision.” Osborn v. Visa, 797 F.3d 1057, 1063 (D.C.Cir.2015) (internal quotation marks omitted). Here, because Plaintiffs are not directly subjected to the regulation they challenge, “standing is ‘substantially more difficult to establish.’ ” Public Citizen, Inc. v. Nat’l Highway Traffic Safety Admin. (Public Citizen I), 489 F.3d 1279, 1289 (D.C.Cir.2007) (citing Defs. of Wildlife, 504 U.S. at 562, 112 S.Ct. 2130). In order to have suffered an injury in fact, Plaintiffs must have suffered an injury that is “(1) concrete, .(2) particularized, and (3) actual or imminent.” Id. at 1292. A concrete injury is “direct, real, and palpable — not abstract.” Id. A particularized injury is “personal, individual, distinct, and differentiated — not generalized or undifferentiated.” Id. An actual or imminent injury is “certainly impending and immediate — not remote, speculative, conjectural, or hypothetical.” Id. at 1293.
Here, Plaintiffs claim their injury in fact is an increased risk of foodborne illness from unwholesome, adulterated poultry resulting from the Defendants’ regulation.[4] Inereased-risk-of-harm cases implicate the requirement that an injury be actual or imminent because “[w]ere all purely speculative increased risks deemed injurious, the entire requirement of actual or imminent injury would be rendered moot, because all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury.” Id. at 1294 (quoting NRDC v. EPA (NRDC II), 464 F.3d 1, 6 (D.C.Cir.2006)) (internal quotation marks omitted). Furthermore, “[t]he Supreme Court has repeatedly held that disputes about future events where the possibility of harm to any given individual is remote and speculative are properly left to the policymaking Branches, not the Article III courts.” Id. at 1295. As a result, this Court has limited its jurisdiction over cases alleging the possibility of increased-risk-of-harm to those where the plaintiff can show “both (i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account.”' Id. at 1295 (emphasis in original); accord Susan B. Anthony List, 134 S.Ct. at 2341 (“An allegation of future injury may suffice if the threatened injury is ‘certainly impending,’ or there is a “ ‘substantial risk’ ” that the harm will occur.’ ” (quoting Clapper v. Amnesty Int'l USA, — U.S. -, 133 S.Ct. 1138, 1147 n. 5, 1150, 185 L.Ed.2d 264 (2013))). “The word ‘substantial’ of course poses questions of degree, questions far from fully *915 resolved.” Va. State Corp. Comm’n v. FERC, 468 F.3d 845, 848 (D.C.Cir.2006).
Although Plaintiffs may establish standing by demonstrating an increased risk of harm, “[i]n applying the ‘substantial’ standard, we are mindful ... that the constitutional requirement of imminence ... necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as ‘substantial.’ ” Public Citizen I, 489 F.3d at 1296. Accordingly, “the proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm — such as death, physical injury, or property damage ...— as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently ‘imminent’ for standing purposes.” Id. at 1298.
The Individual Plaintiffs’ and FWW members’ alleged harm is the foodborne illness that would result from consuming adulterated, unwholesome chicken produced under the NPIS. In order to have standing, therefore, Plaintiffs at least need to plausibly allege that the NPIS substantially increases the risk of foodborne illness when compared to the existing inspection methods. Accordingly, in order to satisfy this Court’s two-part analysis,' the Plaintiffs must demonstrate, under the relevant standard, (1) that the NPIS substantially increases the risk of contracting foodborne illness compared to the existing inspection methods, and (2) a substantial probability that the Individual Plaintiffs and FWW members will contract a food-borne illness given that increase of risk. A failure to satisfy either of these prongs would deprive this Court of jurisdiction to hear Plaintiffs’ case. See Public Citizen I, 489 F.3d at 1295.
A.
Plaintiffs argue that their complaint and submissions in support of their motion for preliminary injunction sufficiently establish that the NPIS substantially increases the risk of harm that will arise from consuming unwholesome, adulterated poultry. Defendants submit that Plaintiffs have failed to demonstrate a substantially increased risk of harm.
We find that Plaintiffs’ complaint, as well as their various submissions in support of their motion for preliminary injunction, fails to plausibly allege that the NPIS taken as a whole substantially increases the risk of foodborne illness as a result of unwholesome, adulterated poultry. First, a careful examination of Plaintiffs’ allegations demonstrates that they have not plausibly alleged that the NPIS substantially increases the risk of foodborne illness compared to the existing inspection systems. To be sure, Plaintiffs’ submissions contained detailed allegations about how HIMP, and by extension, the NPIS, differs from the existing poultry inspection systems. See Compl. ¶¶ 31-77, J.A. 16-25. The complaint is replete with what Plaintiffs argue are the NPIS’s inadequacies. See Compl. ¶¶ 78-126, J.A. 25-29. The complaint also outlines what Plaintiffs perceive are the flaws with the HIMP studies and analyses. See Compl. ¶¶ 148-61, J.A. 33-35. However, these differences and perceived flaws do not demonstrate a substantial increase in the risk of foodborne illness under the NPIS compared to the existing inspection systems.
To the extent that the presence of adulterated, unwholesome poultry could give rise to an inference of resulting foodborne illness, these allegations still fall short because they fail to allege that the NPIS as a whole will produce significantly more adulterated, unwholesome chicken compared to the existing inspection systems. Plaintiffs’ allegations focus on certain. discrete aspects of the NPIS: the reduced number of *916 online federal inspectors, the speed at which the online federal inspectors must evaluate carcasses, and the substitution of establishment personnel for federal inspectors. See Compl. ¶¶ 78-121, J.A. 25-29. However, Plaintiffs’ complaint contains only a single allegation that references another key aspect the NPIS: the reallocation of resources for offline inspection. Compl. ¶ 183, J.A. 39. Under the NPIS, additional offline verification inspectors will check to see to that inspection protocols are being followed and conduct pathogen testing. See 77 Fed.Reg. at 4422. Plaintiffs’ complaint makes no allegation regarding the impact of increased offline verification inspectors on the presence of adulterated, unwholesome poultry. Although Plaintiffs fault Defendants for failing to account for a reduction in online inspectors in Defendants’ risk assessment, Plaintiffs’ failure to account for the increase in offline inspections and their attendant impact on poultry production prevents us from inferring that the NPIS as a whole substantially increases the risk of foodborne illness.
Other allegations in the complaint reveal the same problem. For example, the complaint outlines HIMP personnel’s alleged failure to catch disease-related conditions on poultry. See Compl. ¶ 177, J.A. 38 (“An FWW analysis of the data for 14 HIMP plants found that out of 229 [Noncompliance Reports] filed from March to August 2011, 208 (90 percent) were for visible fecal contamination that was missed by company employees.”). Although these allegations, at best, give rise to the inference that establishment personnel will not be as effective in identifying adulterated poultry, they do not allege how NPIS inspection as a whole will impact the amount of adulterated poultry. Notably, these allegations do not allege that these results are worse than what plants do under existing inspection systems. Thus, they fail to plausibly allege that the regulations substantially increase the risk of foodborne illness.
Plaintiffs’ submissions in support of their motion for preliminary injunction suffer from the same defect. The sworn affidavits from existing USDA inspectors go into great detail about the differences between the NPIS and existing poultry inspection systems. One inspector explained that under the existing inspection systems, they “would have 3 inspectors on each line, with 90 birds per minute split among them, so that each inspector was looking at 30 birds per minute” but under HIMP, one inspector looks “at up to 200 birds, or more, per minute.”[5] J.A. 298. Another inspector claimed, “I know I cannot detect all of the carcasses with Food Safety defects, and it is reasonable to assume that some are going out to the public.” J.A. 306. A third inspector said, “I know the kinds of unwholesome, mutilated, and diseased chickens that are processed and shipped out for sale and I feel it is important to share this information with consumers and taxpayers” because the HIMP system “is tantamount to having the wolves watch the proverbial henhouse, but these chickens are real and they could very likely hurt or kill someone.” J.A. 317. Another inspector who worked previously for a chicken production company and serves currently as a USDA inspector outlined the various pressures that poultry production personnel are under to increase the number of birds that are shipped out to consumers. J.A. 32124. Although these statements may be alarming, even taken as true, they do not allege that there *917 is a substantially increased risk of food-borne illness because they do not allege that the risk of unwholesome, adulterated poultry is higher under the NPIS as a whole than the existing inspection systems.
Plaintiffs could perhaps overcome this deficiency by providing the Court with an alternative basis from which to infer that NPIS inspection results in a substantially increased risk of unwholesome, adulterated poultry. Here, if Plaintiffs could plausibly allege through their use of statistics that NPIS poultry creates a substantial increase in the risk of foodborne illness, they would allege a sufficient injury for standing. We have, in the past, refused to require a quantitative analysis in order to establish standing in increased-risk-of-harm cases, see NRDC II, 464 F.3d at 7, and we likewise refuse to hold that statistics are required for such cases. However, we remain mindful that “[determining whether a complaint states a plausible claim [of injury] is context-specific, requiring the reviewing court to draw on its experience and common sense.” Ashcroft v. Iqbal, 556 U.S. 662, 663-64, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Accordingly, where a plaintiffs allegations incorporate statistics and the plaintiff contends that the statistics demonstrate a substantial increase in the risk of harm, the plaintiff must allege something from which the Court can infer that risk. Using our experience and common sense, we cannot make this inference from Plaintiffs’ statistics.
A review of Plaintiffs’ statistics demonstrates their failure to plausibly allege a substantial increase in the risk of harm. Plaintiffs point to isolated statistics where Defendants found Salmonella rates to be “higher” in chicken processed in HIMP establishments than in non-HIMP establishments, but the complaint does not specify how much higher the rates were. See Compl. ¶¶ 162-164, J.A. 35-36. Plaintiffs also submitted selections from an FSIS report that found under some scenarios, “a 0.2% increase in the proportion of samples testing Campylobacter positive,” but the same page of this report concluded that under most projected scenarios, the samples testing positive for Salmonella or Campylobacter would decrease. J.A. 430. Plaintiffs also alleged that 0.1% of Campy-lobacter illnesses would be attributable to the NPIS “under some scenarios.” Compl. ¶ 180, J.A. 39. Plaintiffs likewise relied on Defendants’ risk assessment assumption that annual Salmonella and Campylobacter illness “attributable] to poultry are about 174,686 and 169,005, respectively.” J.A. 430. Plaintiffs plucked these statistics from Defendants’ studies but provide no allegations from which we can infer that the statistics reflect a substantial increase in the risk of harm. Indeed, Defendants’ risk assessment concluded under most scenarios that annual illnesses from Salmonella and Campylo-bacter would remain unchanged or would decrease under the NPIS. J.A. 430-31. Even Plaintiffs’ complaint acknowledges that the risk of Campylobacter increase is “ambiguous.” Compl. ¶ 180, J.A. 39. An ambiguous increase in risk is hardly a substantial increase in risk.
Plaintiffs’ statistics suffer from additional problems. First, these studies predate the final rule’s amendments. Although not necessarily a problem by itself, the rule’s amendments specifically lowered the line speeds (one of Plaintiffs’ chief criticisms) and made the transition to NPIS inspection voluntary. Plaintiffs make no allegations about the impact of these changes on their statistical claims. Furthermore, Plaintiffs fail to account for how increased allocations in offline inspections would impact the risk. In this context, Plaintiffs’ statistics do not plausibly allege that NPIS inspection as a whole substantially increases the risk that poultry will be contaminat *918 ed with Salmonella or Campylobacter compared to the existing inspection systems.[6] Because Plaintiffs have failed to plausibly allege that, the NPIS substantially increases the risk of producing unwholesome, adulterated poultry compared to the existing inspection systems, they do not have standing.[7]
B.
Plaintiffs also contend that their avoidance of NPIS poultry, or alternatively the increased cost of seeking out poultry from other sources, constitutes an injury in fact to establish standing. Plaintiffs argue that they have taken these steps to avoid potential injury from NPIS-produced poultry. Plaintiffs’ complaint alleges that FWW “[m]embers who wish to continue to eat chicken will have to spend additional resources to seek out and purchase poultry from plants that have not adopted NPIS, if this is even possible. FWW members that have lost all confidence in USDA’s inspection legend will simply avoid eating chicken altogether.” Compl. ¶ 6, J.A. 11-12. Plaintiffs’ declarations in support of their motion for a preliminary injunction contain more detailed allegations of avoidance and increased cost, making clear that such costs would be incurred due to their fear of illness from contaminated poultry produced under the NPIS. Jane Foran expressed concern that NPIS poultry may “cause harm to [her] family and [her] health,” leading her to “stop eating chicken in restaurants” and to “look for farmers’ markets or co-ops.” Foran Decl. ¶¶ 11, 13, J.A. 49. Margaret Sowerwine explained that she was “concerned that there will be moré contaminated and lower-quality poultry” and that she may “purchas[e] product that could make [her] sick.” Sowerwine Decl. ¶¶ 7, 9, J.A. 53-54. As a result, she planned to “find a local farmer” for her poultry purchases, resulting in increased costs or avoiding poultry completely if she cannot afford it. Id. ¶ 10, J.A. 54. Wendy Davis feared that she “will be purchasing product that could make [her] or [her] husband sick or even die.” Davis Decl. ¶ 8, J.A. 59. Alina Pittman was “concerned that the USDA’s NPIS rules will allow for more chicken and turkey that is not safe and unwholesome,” which will cause her to “look for farmers’ markets” where her “costs will go up considerably.” *919 Davis Decl. ¶¶ 10, 14, J.A. 64, 65. Plaintiffs argue that these avoidance costs are not self-inflicted injuries and are sufficient to establish standing.
In Clapper, the Supreme Court explained that plaintiffs “cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending” because such injuries “are not fairly traceable” to the conduct creating that fear. 133 S.Ct. at 1151. “[Otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing by making an expenditure based on a nonparanoid fear.” Id. As explained in Section III.A, Plaintiffs have not plausibly alleged that they face a substantial increase in the risk of harm from NPIS-produced poultry. Just as the respondents in Clapper could not repackage their “first failed theory of standing” as a theory of costs, id., Plaintiffs here cannot establish standing by incurring costs that “are simply the product of their fear of’ NPIS poultry, id. at 1152. Accordingly, Plaintiffs’ “self-inflicted injuries are not fairly traceable” to the NPIS, “and their subjective fear ... does not give rise to standing.” Id. at 1152-53.
IV.
FWW argues that it has standing to pursue its claims on its own behalf. FWW may assert standing on its own behalf, but organizational standing requires FWW, “like an individual plaintiff, to show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.” Equal Rights Ctr., 633 F.3d at 1138 (internal quotation marks omitted). An organization must allege more than a frustration of its purpose because frustration of an organization’s objectives “is the type of abstract concern that does not impart standing.” Nat’l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433 (D.C.Cir.1995). “The court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised.” Abigail All. for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 133 (D.C.Cir.2006). Accordingly, for FWW to establish standing in its own right, it must have “suffered a concrete and demonstrable injury to [its] activities.” PETA v. USDA, 797 F.3d 1087, 1093 (D.C.Cir.2015) (internal quotation marks omitted). Making this determination is a two-part inquiry — “we ask, first, whether the agency’s action or omission to act injured the [organization’s] interest and, second, whether the organization used its resources to counteract that harm.” Id. at 1094 (internal quotation marks omitted). We need not address the second prong of this inquiry because it is clear that FWW has not sufficiently alleged an injury to its interest.
To allege an injury to its interest, “an organization must allege that the defendant’s conduct perceptibly impaired the organization’s ability to provide services in order to establish injury in fact.” Turlock Irrigation Dist. v. FERC, 786 F.3d 18, 24 (D.C.Cir.2015) (internal quotation marks omitted). An organization’s ability to provide services has been perceptibly impaired when the defendant’s conduct causes an “inhibition of [the organization’s] daily operations.” PETA 797 F.3d at 1094 (quoting Action All. of Senior Citizens of Greater Phila. v. Heckler, 789 F.2d 931, 938 (D.C.Cir.1986)). Our precedent makes clear that an organization’s use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury. Id. at 1093-94; Turlock Irrigation *920 Dist., 786 F.3d at 24. Furthermore, an organization does not suffer an injury in fact where it “expend[s] resources to educate its members and others” unless doing so subjects the organization to “operational costs beyond those normally expended.” Nat’l Taxpayers Union, Inc., 68 F.3d at 1434; see also Nat’l Ass’n of Home Builders v. EPA, 667 F.3d 6, 12 (D.C.Cir.2011) (organization’s expenditures must be for “ ‘operational costs beyond those normally expended’ to carry out its advocacy mission” (quoting Nat’l Taxpayers Union, 68 F.3d at 1434)).
According to Patricia Lovera, the Assistant Director of FWW, one of FWW’s “primary purposes is to educate the public about food systems that guarantee safe, wholesome food produced in a sustainable manner.” Lovera Decl. ¶ 4,[8] J.A. 68. As a result, FWW is concerned that NPIS will allow inadequately trained staff to inspect food and that food safety will suffer because inspection will be turned over to poultry establishment personnel. Id. ¶¶ 8-9, 21, J.A. 69-70, 72-73. Lovera contends that allowing the NPIS to go into effect will cause “all of the organization’s time and resources spent advocating against NPIS [to have been] wasted.” Id. ¶ 10, J.A. 70. Lovera also claims that “FWW would have to increase the resources that it spends on educating the general public and its members that the NPIS rules do not allow for the inspection of poultry product prescribed by the PPIA.” Id. ¶ 11, J.A. 70. Additionally, “FWW will spend time and money on increasing its efforts to educate members of the public that just because a poultry product has a USDA inspection legend does not mean that it is not adulterated and is wholesome.” Id. ¶ 12, J.A. 70-71. Finally, Lovera states that “FWW will increase the amount of resources that it spends encouraging its members who wish to continue to eat chicken to avoid poultry from such companies” and “to purchase poultry at farmers’ markets or direct from producers.” Id. ¶ 13, J.A. 71.
Lovera’s statements make clear that FWW has alleged no more than an abstract injury to its interests. Our recent decision in PETA is instructive. In PETA, an animal-welfare organization challenged the USDA’s failure to apply statutory general animal welfare requirements to birds. 797 F.3d at 1089-91. Ordinarily, when the USDA applied the animal welfare requirements, an outside organization like PETA could seek redress for mistreatment by filing a complaint with the USDA. Because the USDA refused to apply those requirements to birds, PETA could not seek redress for mistreatment of birds through the USDA’s complaint procedures. Id. at 1091. Additionally, because the USDA was not applying the requirements to birds, the USDA was not generating inspection reports that the organization used to educate its members. Id. The agency inaction injured the organization because the organization suffered a “denial of access to bird-related ... information including, in particular, investigatory information, and a means by which to seek redress for bird abuse” Id. at 1095. We found these injuries to be “concrete and specific to the work” in which the organization was engaged. Id. (quoting Action All., 789 F.2d at 938). The denial of access to an avenue for redress and denial of information “perceptibly impaired [the organization’s] ability to both bring [statutory] violations to the attention of the *921 agency charged with preventing avian cruelty and continue to educate the public.” Id. (internal quotation marks omitted).
In the present case, taking all of FWW’s allegations and Lovera’s statements as true, FWW has alleged nothing more than an abstract injury to its interests that is insufficient to support standing. FWW does not allege that the NPIS limits its ability to seek redress for a violation of law. Nor does FWW allege that the USDA’s action restricts the flow of information that FWW uses to educate its members. Although Lovera alleges that FWW will spend resources educating its members and the public about the NPIS and USDA inspection legend, nothing in Lovera’s declaration indicates that FWW’s organizational activities have been perceptibly impaired in any way.[9] Accordingly, FWW has not alleged an injury to its interest to give rise to organizational standing.
V.
Plaintiffs’ final standing argument on the basis of procedural injury is easily resolved. Plaintiffs claim that they have suffered a procedural injury sufficient to establish standing because Defendants violated their procedural rights. However, “the omission of a procedural requirement does not, by itself, give a party standing to sue.” Ctr. for Biological Diversity v. U.S. Dep’t of Interior, 563 F.3d 466, 479 (D.C.Cir.2009). “[DJeprivation of a procedural right without some concrete interest that is affected by the deprivation — a procedural right in vacuo — is insufficient to create Article III standing.” Summers v. Earth Island Inst., 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009). As explained in the foregoing, Plaintiffs have failed to establish that they will suffer any cognizable injury. Because Plaintiffs “have failed to establish that they will likely suffer a substantive injury, their claimed procedural injury ... necessarily fails.” Sierra Club v. EPA, 754 F.3d 995, 1002 (D.C.Cir.2014).
VI.
For the foregoing reasons, we hold that Plaintiffs have failed to show any cognizable injury sufficient to establish standing. Accordingly, we affirm the District Court.

So ordered.

. The PPIA defines an inspector as "(1) an employee or official of the United States Government authorized by the Secretary to inspect poultry and poultry products under the authority of this chapter, or (2) any employee or Official of the government of any State or territory or the District of Columbia authorized by the Secretary to inspect poultry and poultry products under authority of this chapter.” 21 U.S.C. § 453(k).

. Viscera are "[t]he soft contents of the principal cavities of the body” which includes "the entrails or bowels together with the heart, liver, lungs, etc.” Oxford English Dictionary (3d ed.2007).

. The District Court also held that the Individual Plaintiffs and FWW lacked informational standing, but Plaintiffs do not appeal those rulings. See Food & Water Watch, 79 F.Supp.3d at 196-99, 203-04.

. Because Plaintiffs argue that their increased risk of harm, or alternatively, that the costs associated with avoiding that risk constitute injuries sufficient for standing, we address those injuries separately.

. This number is higher than the final rule, which limits the speed for young Chickens to 140 birds per minute. 79 Fed.Reg. at 49570, Plaintiffs claim this number remains too high. Compl. ¶¶ 92-99, J.A. 27.

. Our conclusion that Plaintiffs' statistics do not plausibly allege a substantial increase in the risk of harm here does not mean that a plaintiff could never plausibly allege such an increase through the use of statistics culled from government-conducted studies that reach conclusions contrary to the plaintiff's allegations. Rather, it means that, to the extent a plaintiff relies on statistics to show a substantial increase in the risk of harm, a plaintiff cannot allege a bare statistic without plausibly alleging how the statistic reflects a substantial increase in the risk of harm.

. Plaintiffs ask us to follow the Second Circuit’s approach to increased-risk-of-foodborne illness outlined in Baur v. Veneman, 352 F.3d 625 (2d Cir.2003). In Baur, the Second Circuit held "that exposure to an enhanced risk of disease transmission may qualify as injuiy-in-fact in consumer food ... suits.” Id. at 628. Baur's approach to increased-risk-of-harm cases is not without controversy. See Va. State Corp., 468 F.3d at 848 (noting the conflict among the circuits about what increase in risk must be shown to support standing); NRDC v. ERA (NRDC I), 440 F.3d 476, 484 (D.C.Cir.2006), vacated by rh’g en banc, NRDC II, 464 F.3d 1 (noting the potential “expansiveness” of Baur's reasoning). However, we need not resolve any controversy here. Although Baur makes passing reference to "a moderate increase in the risk of disease,” id. at 637, the Second Circuit’s reasoning focused on the probability of the plaintiff suffering harm, see id.; see also NRDC I, 440 F.3d at 483 (describing Baur in the context of increased probability of harm). Because we resolve Plaintiffs’ standing on the first prong of the Public Citizen I analysis, Baur does not impact our analysis here.

. The declaration erroneously contains two paragraphs numbered as "4." This citation refers to the second of those paragraphs.

. The concurrence contends that FWW has met the first prong of the organizational standing analysis because, taking FWW's allegations as true, the complaint has alleged a "direct conflict” between the NPIS and FWW’s mission. Cone. Op. at 924-25 n. 5 (Henderson, J.). However, even if FWW were to allege a "direct conflict,” an issue on which we express no opinion, FWW would still need to allege an injury to its interest. "[I]n those cases where an organization alleges that a defendant’s conduct has made the organization’s activities more difficult, the presence of a direct conflict between the defendant's conduct and the organization’s mission is necessary — though not alone sufficient — to establish standing.” Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1430 (D.C.Cir.1996); see also Am. Soc’y for Prevention of Cruelty to Animals v. Feld Entm’t, Inc., 659 F.3d 13, 25 (D.C.Cir.2011) ("If the challenged conduct affects an organization’s activities, but is neutral with respect to its substantive mission, we have found it 'entirely speculative’ whether the challenged practice will actually impair the organization's activities.” (quoting Nat’l Treasury Emps. Union, 101 F.3d at 1430)).