# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 7, 2015          Decided August 14, 2015

No. 13-5293

HUMANE SOCIETY OF THE UNITED STATES,
APPELLANT

HARVEY DILLENBURG AND IOWA CITIZENS FOR COMMUNITY
IMPROVEMENT,
APPELLEES

v.

THOMAS J. VILSACK, SECRETARY OF THE U.S. DEPARTMENT
OF AGRICULTURE,
APPELLEE

Consolidated with 13-5307

Appeals from the United States District Court
for the District of Columbia
(No. 1:12-cv-01582)

*Matthew E. Penzer* argued the cause for appellants. With him on the briefs was *Jonathan R. Lovvorn*. *Ralph E. Henry* entered an appearance.

*Abby C. Wright*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were

*Ronald C. Machen Jr.*, U.S. Attorney at the time the brief was filed, and *Scott R. McIntosh*, Attorney.

Before: GRIFFITH, SRINIVASAN and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  The plaintiffs, a pork producer named Harvey Dillenburg and two animal welfare organizations who count pork producers among their members, claim that the National Pork Board has misappropriated millions of dollars from a fund for pork promotion into which pork producers are required to pay. The plaintiffs filed suit in federal district court and the court dismissed their claim for a lack of standing.  We reverse.

## I.

The National Pork Board is a quasi-governmental entity responsible for administering a federal regulatory scheme known as the "Pork Order."  *See* 7 U.S.C. § 4808; *see also* 7 C.F.R. Part 1230.  The Order implements the Pork Act, 7 U.S.C. §§ 4801-19, the purpose of which is to promote pork in the marketplace, *see* 7 U.S.C. § 4801(b)(1).  The Board strengthens, maintains, develops, and expands markets for pork and pork products through research and consumer information campaigns.  In exchange for the Board's efforts on behalf of their industry, pork producers pay the Board a special assessment on each hog they import or sell.  *See* 7 C.F.R. § 1230.71(b).

In 2006, the Board, with the approval of the Secretary of the Department of Agriculture, bought four trademarks associated with the slogan *Pork: The Other White Meat*

(hereinafter "the slogan" or "the mark") from the National Pork Producers Council, an industry trade group, for $60 million.[1] The payment terms provide that the Board will pay the Council $3 million annually for twenty years. The Board can terminate the payments at any time with one year's notice, in which case ownership of the phrase reverts back to the Council. Five years after buying the mark, the Board replaced it with a new motto, *Pork: Be Inspired*. Now the Board keeps the initial slogan around as a "heritage brand" that it does not feature in its advertising.

The plaintiffs claim that the Board did not buy the slogan for its value as a marketing tool. They allege that the Board used the purchase of the slogan as a means to cut a sweetheart deal with the Council to keep the Council in business and support its lobbying efforts. They maintain that the Board overpaid for the slogan and that the Board's shift to the *Pork: Be Inspired* campaign makes the initial slogan all but worthless. According to the plaintiffs, the purchase of the mark and continued payment for it was and is arbitrary and capricious. The plaintiffs also argue that the Board's purchase of the slogan with the purpose of supporting the Council's lobbying efforts violates the Pork Act and Order's prohibitions against the Board spending funds to influence legislation. *See* 7 U.S.C. § 4809(e); 7 C.F.R. § 1230.74.

The plaintiffs sued the Secretary of the Department of Agriculture under the Administrative Procedure Act seeking

---

[1] The Secretary of the Department of Agriculture is charged with reviewing and approving the Board's actions. *See* 7 U.S.C. § 4808(b)(3); 7 C.F.R. § 1230.60(a). In this opinion, for clarity and concision, we attribute Board-recommended, Secretary-approved actions to the Board even though ultimate authority and liability for those actions runs against the Secretary.

an order enjoining the Board's further payments to the Council and directing the Secretary to claw back what payments he can from the deal. The district court dismissed the plaintiffs' suit for lack of Article III standing. *See Humane Soc'y v. Vilsack*, 19 F. Supp. 3d 24, 29 (D.D.C. 2013). The court held that Dillenburg failed to establish an injury in fact fairly traceable to the Board's actions that is likely to be redressed by a favorable decision. *Id.* at 34-42. It also held that the two plaintiff organizations could not establish standing to sue in their own right or on behalf of their pork-producing members. *Id.* at 42-47. The plaintiffs appealed via separate notices and we consolidated the cases for review.

For the reasons that follow, we reverse and remand. This case involves a concrete and particularized harm caused by an agency's failure to confer a direct economic benefit on a statutory beneficiary. We also reject the government's argument that the plaintiffs have failed to exhaust their administrative remedies. The statute's provision for administrative review would not offer the plaintiffs adequate relief, and therefore they were not required to pursue it.

## II.

This suit ended on a motion to dismiss. We review such dismissals *de novo*. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). To survive a motion to dismiss for lack of standing, a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Determining a claim's plausibility is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. We accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in the plaintiffs' favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007).

**A.**

Dillenburg has made out a plausible claim to Article III standing. His argument is simple. He says that his return on his investment has been diminished by the Board's unlawful payments of $3 million per year for *Pork: The Other White Meat*. If the Board stopped paying for the slogan, recouped funds unlawfully channeled to the Council, and devoted the money saved to more effective pork promotions, Dillenburg's alleged harm would be at least partially redressed. Amend. Compl. ¶¶ 15, 128, J.A. 11, 34. That claim, if supported by sufficient factual allegations to "nudge [it] . . . from conceivable to plausible," *Twombly*, 550 U.S. at 570, is sufficient to establish Article III standing. Dillenburg's claim readily clears that line.

As an initial matter, Dillenburg has alleged a "concrete and particularized" injury. *Lujan*, 504 U.S. at 560. He has alleged facts plausibly showing that the mark was worth less than its $60 million purchase price. Between 2001 and 2004, the Board paid the Council one dollar per year to license the slogan. Amend. Compl. ¶ 59, J.A. 20. In 2004, the Board negotiated a new five-year license with the Council, providing that payments would increase from one dollar per year to $818,000 for three years before reverting back to one dollar per year for the final two years. *Id.* ¶¶ 63, 109, J.A. 21-22, 30-31. The plaintiffs allege that the Board's CEO wrote that the increased license fee was negotiated to "allow the [Council] to get the money they need for the next four years."

*Id.* ¶ 63, J.A. 21-22. Before the Board entered the new licensing agreement, the Board's own economist recommended that the Board pay no more than $375,000 annually to license the mark. *Id.* ¶ 64, J.A. 22. He also advised the Board that it was in a powerful position to dictate favorable terms to the Council because there would be few other buyers willing to purchase a generic slogan closely identified with the promotion of pork. *Id.* ¶ 83, J.A. 25-26. Indeed, there were no competing offers to purchase the slogan. *Id.* ¶ 84, J.A. 26. Those facts raise a plausible inference that the slogan was not worth its purchase price at the time, and is not worth $3 million per year now.

Dillenburg also alleged facts tending to show that the Board's purchase of the mark was not negotiated at arm's length, which increased the plausibility of allegations that the Board paid too much. According to the complaint, the Council and the Board have been intertwined intimately since the Board's formation in the mid-1980s. *Id.* ¶¶ 43-45, 55, J.A. 17, 19-20. The Council lobbied for passage of the Pork Act, and it proposed the text that ultimately served as the foundation for the Pork Order. *Id.* ¶¶ 43, 45, J.A. 17. The Council played an instrumental role in developing the slogan, vetting possible promotions for the Board to undertake, and engaging with advertising agencies to develop them. *Id.* ¶¶ 46-54, J.A. 18-19. Even though the Board paid for the mark's development, the Council registered the mark in its own name and as its sole owner. *Id.* ¶¶ 52-53, J.A. 19. The Board and the Council were so enmeshed that, in 1986 when the Board voted to adopt the campaign and so committed itself to spend tens of millions of dollars in assessment funds over two decades on the promotion, it did not execute any licensing agreement or fee contract to formalize that arrangement. *Id.* ¶ 51, J.A. 19. The Department of Agriculture's Office of Inspector General concluded in a 1999

audit that the Board had "relinquished too much authority to its primary contractor, the [Council], and ha[d] placed the [Council] in a position to exert undue influence over Board budgets and grant proposals." *Id.* ¶ 55, J.A. 19-20. That history, as alleged, raises a plausible inference that the Board's purchase was not the product of arm's-length negotiation.

Dillenburg has also alleged facts plausibly showing that, whatever its value when the Board purchased it, the mark is no longer worth $3 million per year. In 2011, the Board replaced the slogan with a "proud new brand identity"—*Pork: Be Inspired*. *Id.* ¶ 100, J.A. 28. In the same press release in which it announced that it would be adopting *Pork: Be Inspired*, the Board stated that the initial mark would be treated as a "heritage brand," and that "*The Other White Meat* campaign will not be featured in advertising." *Id.* ¶ 101, J.A. 29. The Board's replacement of the mark with *Pork: Be Inspired* justifies the inference that the mark is no longer worth $3 million annually.

That inference is strengthened by the fact that when the Board valued the mark and negotiated its purchase in 2006, it expressly assumed that it would be using the slogan as its primary brand identity for the indefinite future. *Id.* ¶¶ 105-106, J.A. 29-30. At that time, the Board reasoned that it could either purchase the mark from the Council, or spend millions of dollars building a new brand identity. *Id.* ¶¶ 68-72, J.A. 22-23. The Board chose to purchase the slogan. *Id.* ¶ 71, J.A. 23. In a letter seeking approval for the purchase from the Department of Agriculture, the Board stated that its "primary objective" was to purchase the mark for less than the estimated cost of establishing the new brand identity. *Id.* ¶ 72, J.A. 23. The Board's valuation of the slogan incorporated the assumption that it would serve as the Board's

primary brand identity in the future. Now that it is no longer the Board's primary brand identity, the slogan is likely worth substantially less than the $3 million per year the Board pays for it.

Those allegations establish Dillenburg's Article III standing. Dillenburg's injury is a classic form of concrete and particularized harm: actual economic loss. *See Sierra Club v. Morton*, 405 U.S. 727, 736-37 (1972); *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1042 (D.C. Cir. 2010). The Board's allegedly unlawful overpayments for an advertising campaign it does not use divert funds from other promotions. Because of that pork demand is lower, and thus the price at which pork producers can sell their hogs is lower than it would be if the Board were spending those funds on legitimate promotions and other demand-enhancing campaigns rather than squandering them with the Council. The misuse of the assessment funds cognizably harms Dillenburg's bottom line. *See, e.g.*, *United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (explaining that "courts routinely credit" allegations founded on the "application of basic economic logic"); *see also Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998) (explaining that a "petitioner who is likely to suffer economic injury as a result of [governmental action] that changes market conditions satisfies" Article's III injury-in-fact requirement) (alterations in original) (quoting 3 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* 13-14 (3d ed. 1994)).

Traceability and redressability readily follow. Dillenburg's harm is caused by the Board's failure to spend his mandatory assessment funds on legitimate promotions. The harm is thus "fairly traceable" to the challenged action. *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). Furthermore, if the Board were ordered to stop paying $3

million annually for the mark, it would be required by law to use those funds reasonably and for legitimate purposes, an outcome likely at least partially to redress his injury. *See Massachusetts v. EPA*, 549 U.S. 497, 525-26 (2007) (explaining that litigation success need only partially redress a plaintiff's injury to meet the redressability requirement). The close relationship between a holding that the funds are being unlawfully used and a remedy that would make them available for lawful, more effective uses makes it "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).

We therefore conclude that Dillenburg has alleged a plausible claim to Article III standing. Because we find that Dillenburg has standing, we need not and do not reach the arguments of the other plaintiffs regarding their standing. *See Mendoza*, 754 F.3d at 1010; *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

**B.**

The government argues that we should affirm the district court's order dismissing the complaint on the alternative ground that the plaintiffs failed to exhaust their administrative remedies. We reject that argument because the statute offers administrative relief that, in the context of this case, is too "doubtful and limited" to justify requiring the plaintiffs to pursue it. *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988).

Under the relevant provision of the Pork Act, any person subject to "an order" may petition the Secretary of the Department of Agriculture (1) "stating that such order, a provision of such order, or an obligation imposed in connection with such order is not in accordance with law" and (2) "requesting a modification of such order or an exemption

from such order." 7 U.S.C. § 4814(a)(1). The government contends that the plaintiffs were required to petition the agency to exempt them from their payment obligations under the Pork Order, or seek a modification of the Pork Order prohibiting the Board from making the expenditures to which they objected. Appellee Br. 17-19.

There is reason to doubt that the exhaustion provision applies to the plaintiffs' claims at all. The statute provides that an individual subject to the Pork Order must "stat[e]" in his petition for relief "that such order, a provision of such order, or an obligation imposed in connection with such order is not in accordance with law." 7 U.S.C. § 4814(a)(1)(A). But the plaintiffs are not claiming that any provision of the Pork Order itself is "not in accordance with law." The government asserts, however, that the plaintiffs fall within the provision because the Board's misappropriation of assessment funds transforms otherwise lawful assessments into "obligation[s] imposed in connection with" the Pork Order "not in accordance with law." *Id.* That is a strained reading of the provision.

Even assuming the plaintiffs came within the Pork Act's administrative relief provision, the only relief they could obtain would be inadequate. *See Bowen*, 487 U.S. at 901. The Act provides only two administrative remedies: "an exemption from" the Pork Order, or "a modification" of it. 7 U.S.C. § 4814(a)(1)(B). Neither of those remedies would provide plaintiffs anything like the relief they seek. *See Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (explaining that administrative relief must be of the "same genre" as Administrative Procedure Act relief sought).

An exemption from assessments would not remedy the plaintiffs' harms. The plaintiffs seek specific performance.

An exemption is more akin to rescission. The two are not equivalent. Moreover, making exemptions from payment the only relief available to pork producers would undermine the program: Producers who identify actionable abuses of the Board's discretion would be exempted, narrowing the Board's base even as it failed to correct its malfeasance.

Alternatively, a modification of the Pork Order would offer the plaintiffs only doubtful relief. The plaintiffs' claim is that the Secretary is failing to comply with the Pork Act and Order. The plaintiffs do not want to change the rules; they want to see the existing rules enforced. Modifying the Order will not get them that. Because neither an exemption nor a modification of the Pork Order would offer the plaintiffs adequate relief, they were not required to pursue an administrative path that offered only those two remedies.

\* \* \*

For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion.

*So ordered.*