**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-1458**

---

RISE FOR ANIMALS; ANIMAL LEGAL DEFENSE FUND,

       Plaintiffs - Appellants,

    v.

GARY WASHINGTON, Acting Secretary of the United States Department of Agriculture; SARAH HELMING, Deputy Administrator of Animal Care,

       Defendants - Appellees.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Julie R. Rubin, District Judge.  (8:22-cv-00810-JRR)

---

Argued:  May 7, 2025                            Decided:  July 22, 2025

---

Before THACKER, HARRIS, and QUATTLEBAUM, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:**  James Andrew Erselius, ANIMAL LEGAL DEFENSE FUND, Washington, D.C., for Appellants. Brian James Springer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:**  Daniel H. Waltz, ANIMAL LEGAL DEFENSE FUND, Washington, D.C., for Appellants.  Brian M. Boynton, Principal Deputy Assistant Attorney General, Daniel Tenny, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Erek L. Barron, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Rise for Animals[1] and Animal Legal Defense Fund[2] ("Appellants") sued the United States Department of Agriculture ("USDA") pursuant to the Administrative Procedure Act ("APA") for an alleged violation of the Animal Welfare Act ("AWA"). Because we conclude that Appellants lack standing, we affirm the district court's grant of the USDA's motion to dismiss.

I.

In order to carry out their missions, Appellants rely on inspection reports produced by the USDA to ensure animals being used for research purposes are treated humanely in compliance with the AWA. The AWA requires the USDA to conduct inspections; memorialize the findings of those inspections in inspection reports; and maintain a publicly available database of those inspection reports. In this litigation, Appellants claim an informational injury because the published inspection reports, to which they have access, do not detail every instance of AWA noncompliance.

---

[1]According to their website, Rise for Animals "is a national animal rights organization on a mission to end nonhuman animal experimentation in our lifetimes. . . [by] advocat[ing] for the abolition of nonhuman animal experimentation, including the liberation of nonhuman animals." *About Us*, Rise for Animals, (July 3, 2025), https://perma.cc/5JWQ-WL8X.

[2] Animal Legal Defense Fund describes itself as an organization which seeks to "protect the lives and advance the interests of animals through the legal system." *Animal Legal Defense Fund*, About Us, (July 3, 2025), https://perma.cc/CX97-25MY.

3

A.

In 1966, Congress passed the AWA "to ensure that animals intended for use in research facilities or for exhibition purposes . . . are provided humane care and treatment." 7 U.S.C. § 2131.  Congress charged the Secretary of the USDA ("Secretary"), or the Secretary's delegated representative, with enforcement of the AWA.  *Id.* at § 2146.  The Secretary has delegated this enforcement authority to the Animal Plant and Health Inspection Service ("APHIS").  7 C.F.R. § 2.80(a)(6).  In this capacity, APHIS "shall promulgate standards to govern the humane handling, care, treatment and transportation of animals by dealers, research facilities, and exhibitors."  7 U.S.C. § 2143(a)(1).  These standards "include minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter[,] . . . [and] adequate veterinary care . . . necessary for [the] humane handling, care, or treatment of animals."  *Id.* at § 2143(a)(2)(A).

1.

To ensure these minimum requirements are being maintained, the AWA requires APHIS to "make such investigations or inspections as [it] deems necessary to determine whether any [covered entity] . . . has violated or is violating any provision of [the AWA] or any regulation."  7 U.S.C. § 2146(a).  The AWA imposes additional requirements for animals housed in "research facilities."  *Id.* at § 2136.  A research facility is defined as any organization that "uses or intends to use live animals in research, tests, or experiments and that (1) purchases or transports live animals in commerce, or (2) receives funds" from the federal government for research purposes.  *Id.* at § 2132(e).  The AWA requires APHIS to inspect research facilities "at least once a year."  *Id.* at § 2146(a).  If any deficiencies or

4

deviations from the AWA standards are identified, APHIS is required to "conduct such follow-up inspections as may be necessary until all deficiencies or deviations from such standards are corrected." *Id.* We refer to this annual inspection requirement contained in § 2146(a) as the "Inspection Provision."

Despite the Inspection Provision, the AWA does not define "inspect" or "inspection." But the USDA publishes an "Animal Welfare Inspection Guide" in order to "provide an aid for APHIS Animal Care Personnel when inspecting USDA licensed and registered facilities." *Rise for Animals v. Vilsack*, 8:22-cv-00810-JRR, ECF No. 38 (D. Md. Oct. 16, 2023). The Animal Care unit of APHIS "has the responsibility of inspecting all facilities covered under the AWA and following up on complaints of abuse and noncompliance." *Id.* Importantly, "the Inspection Guide is not a regulation and does not rise to the level of policy," but is a "tool to improve the quality and uniformity of inspections, documentation, and enforcement of the Animal Care Program." *Id.*

The Inspection Guide details two different types of inspections conducted by APHIS: routine or focused. A routine inspection is a "normal periodic, unannounced inspection including [a] complete inspection of the facility." *Id.* A focused inspection is far less intensive, involving an "unannounced inspection covering a localized area of a facility." *Id.* These localized areas can include either re-inspection in connection with previously identified instances of noncompliance, a "partial inspection of the facility, such as animals or records only", or "a partial inspection to follow up on a public complaint concerning animal welfare." *Id.* "Thus, in general, a 'focused' inspection requires less

5

time and resources to conduct than a 'routine' inspection." J.A. 104.[3] Prior to February 2019, APHIS maintained sole responsibility for fulfilling the Inspection Provision's requirement and, up until that time, only a routine inspection was sufficient to satisfy the Inspection Provision.

2.

In addition to the Inspection Provision, the AWA requires APHIS to memorialize the findings of the required inspections in publicly available inspection reports ("the Database Provision"). 7 U.S.C. § 2146a(b)(1). The Database Provision requires APHIS to "make publicly available via searchable database, in their entirety, without redactions all final [AWA] inspection reports, including all reports documenting all [AWA] violations and non-compliances observed by USDA officials." *Id.* APHIS must make public "all reports or other materials documenting any violations and non-compliances observed by USDA officials for the current year and the preceding three years." *Id.* at (b)(3).

B.

In January 2018, the USDA and APHIS solicited public comment on a proposed inspection policy change. Specifically, notice and comment was solicited on the issue of whether "a reduction in the frequency of APHIS inspections [would] be a sufficient incentive for regulated facilities to use third-party programs to support compliance under the AWA." J.A. 115. APHIS was seeking to determine if third party inspection and certification programs could meaningfully substitute for APHIS inspections, thereby

---

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

6

lightening the APHIS workload without increasing noncompliance with the AWA. APHIS highlighted the Association for Assessment and Accreditation of Laboratory Animal Care ("AAALAC") as one of the third-party inspection and certification programs to which APHIS was considering deferring.

The AAALAC is a private, nonprofit organization that promotes the humane treatment of animals in science through a voluntary accreditation program. The AAALAC provides accreditation to research facilities and consists of "entities invested in the use of animals in experimentation." J.A. 149. To obtain AAALAC accreditation, a research facility must submit an application fee and a description of its animal testing and use practices. Then, AAALAC representatives conduct a site visit and prepare a report based on standards derived from an internal AAALAC guidebook recommending an accreditation status. Once accredited, an organization must pay AAALAC an annual fee in order to maintain accreditation.

In response to the USDA and APHIS' comment solicitation on the proposed inspection policy change, the "vast majority" of "stakeholders on all sides of the issue expressed strong interest in [APHIS] maintaining full responsibility for inspections and AWA compliance," rather than outsourcing that responsibility to third parties. J.A. 191. Specifically, commentors advised APHIS not to rely on AAALAC accreditation because of the potential for conflicts of interest due to the AAALAC funding and membership structures. AAALAC's membership body, and most of the funding for the organization, comes from entities engaged in the very animal research which AAALAC regulates. In response to these comments, APHIS released a public statement, on May 25, 2018,

"announcing that it [would] not establish new criteria for recognizing third-party inspection and certification programs when determining the [APHIS'] own inspection frequency under the Animal Welfare Act." *Id.* at 189.

C.

Despite this public announcement, in February 2019, APHIS proceeded to adopt an inspection policy which relied on AAALAC accreditation to determine the frequency, and depth of inspections ("Focused Inspection Policy"). The rationale provided for the Focused Inspection Policy was "to make efficient use of [APHIS'] finite resources." Appellee's Opening Br. at 4. Pursuant to the Focused Inspection Policy, APHIS instructed its inspectors that only focused inspections should be performed at AAALAC accredited facilities. To communicate this change in policy to APHIS Animal Care staff, APHIS disseminated Focused Inspection Frequently Asked Questions ("FAQ"). The FAQ explained that AAALAC accreditation constituted a dispositive factor in determining whether an inspection should be focused or routine. J.A. 195 ("If a facility is not AAALAC accredited, is it eligible for a focused inspection? No."). In contrast, per the Focused Inspection Policy, inspectors at AAALAC accredited facilities were ordered to inspect either animals, facilities, or paperwork on an annual rotating basis rather than inspecting all three annually. *See id.* at 200 ("You must rotate your focus for each visit (i.e., the focus could be on records one year and animals or facilities the next.)").

After February 2019, per this Focused Inspection Policy, APHIS instructed its inspectors that they must convert a focused inspection into a routine inspection if certain levels of noncompliance are found during a focused inspection, even if the facility in

8

question meets other criteria relevant under the policy, including AAALAC accreditation. And for the first time, the USDA allowed the focused inspections to count as the statutorily required annual inspection of research facilities. Per an email disseminating the FAQ, APHIS referred to this new inspection practice as "Focused Annual Research Inspections for AAALAC Accredited Facilities" and told inspectors that the adoption of this new policy was not to be announced publicly. *See id.* at 203 ("We are using a low-key approach. There will be no stakeholder announcement."); *see also id.* ("[T]he [FAQ] document is for official use, internal only."); *id.* ("This FAQ will not be in the Inspection Guide.").

## D.

On April 5, 2022, Appellants filed suit against the USDA and APHIS alleging that the Focused Inspection Policy violated the AWA. In this suit, Appellants highlighted what they viewed as the secretive manner in which APHIS adopted the Focused Inspection Policy despite publicly announcing that third party accreditation would not impact inspection frequency. *See* J.A. 20 ("[D]espite . . . the agency's own pronouncement that it had decided *not* to implement any such policy, the USDA had nevertheless implemented a new Inspection Policy under which the agency no longer conducted full inspections of all facets of research labs that are accredited by AAALAC." emphasis in original)). Appellants explained that they only became aware of the existence of the Focused Inspection Policy as a result of a previous lawsuit Appellants filed against the USDA. Specifically, in October 2020, Appellants filed suit against the USDA for the failure to timely comply with a Freedom of Information Act ("FOIA") request. In response to the

9

FOIA lawsuit, the USDA produced responsive records which revealed APHIS' adoption of the Focused Inspection Policy.

In the current lawsuit against the USDA and APHIS, Appellants assert that APHIS "evade[d] its statutory obligation to conduct full annual inspections of research facilities as required under the [AWA] . . . without providing a reasoned basis for doing so in violation of the [APA]." J.A. 7 ¶ 1. Accordingly, Appellants allege that the "[Focused] Inspection Policy is 'not in accordance with law' within the meaning of the APA." J.A. 24 ¶ 69. Appellants also allege that the adoption of the Focused Inspection Policy was arbitrary and capricious within the meaning of the APA "in light of all of the limitations that attend AAALAC accreditation and the fact that AAALAC-accredited facilities have a *higher* rate of AWA violations than non-AAALAC facilities." J.A. 24 ¶ 70 (emphasis in original). As a result, Appellants request that the Focused Inspection Policy be declared unlawful and set aside.

The USDA and APHIS moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that Appellants lack standing to challenge the adoption of the Focused Inspection Policy. In the alternative, the USDA and APHIS assert that: Appellants' claims are barred by the statute of limitations pursuant to 28 U.S.C. § 2401(a); Appellants failed to challenge final agency action; the challenged agency conduct is committed to agency discretion by law; and the complaint fails to state a claim on which relief can be granted.

In response to the motion to dismiss, Appellants assert that they possess Article III standing pursuant to an informational standing theory. Appellants claim that the AWA's

10

Database Provision entitles them to inspection reports detailing every instance of AWA noncompliance. Because the Focused Inspection Policy prevented routine inspections at AAALAC facilities, Appellants argue APHIS investigators necessarily missed instances of AWA noncompliance. Therefore, the Focused Inspection Policy prevented Appellants from receiving the fulsome inspection reports to which they claim entitlement.

On March 21, 2024, the district court granted the motion to dismiss based on Appellant's lack of subject matter jurisdiction concluding that Appellants lacked Article III standing because Appellants' reading of the AWA was implausible. *See* J.A. 637 ("[Appellants] argue that they would receive additional information under the statute if the [Focused] Inspection Policy were not in place, and that the court must accept their view. The court disagrees that it is so bound."). The court also dismissed the complaint on the alternative ground that the adoption of the Focused Inspection Policy did not constitute final agency action.

Appellants timely appealed.

## II.

We review a district court's dismissal for lack of jurisdiction due to the lack of Article III standing de novo. *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 429–430 (4th Cir. 2019).

11

III.

A.

To establish standing, a plaintiff must demonstrate: (1) an injury in fact; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Wikimedia Found. v. NSA*, 857 F.3d 193, 207 (4th Cir. 2017). A plaintiff can establish all three of these elements based on an informational injury. *See Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 166 (4th Cir. 2023) ("[A]n informational injury is sufficiently concrete, particularized, and actual to qualify for Article III standing to sue."). An informational injury arises when a plaintiff is deprived of information which is statutorily required to be disclosed to them. In this context, "a plaintiff suffers [a] sufficiently concrete and particularized informational injury where the plaintiff alleges that: (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose[,] and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016); *see also Dreher v. Experian Info. Solutions Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) ("[A] constitutionally cognizable informational injury requires that a person lack access to information to which he is legally entitled *and* that the denial of that information creates a 'real' harm with an adverse effect." emphasis in original)).

It is well established that "when assessing a question of standing to sue, we are not concerned with the merits of the plaintiff's claim." *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 454 (4th Cir. 2017) (citing *White Tail Park, Inc. v. Stroube*, 413 F.3d 451,

12

460 (4th Cir. 2005)).  However, the plaintiffs proffered reading of the statute, which they claim entitles them to information, must be, at minimum, plausible.  *See Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015) (evaluating whether the plaintiff has "made out a plausible claim to Article III standing"); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[T]he standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." (internal citation omitted)); *Laws. Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F.App'x 428, 430 (D.C. Cir. 2021) ("The plaintiff's reading of a statute for informational standing purposes must at least be plausible.").  Therefore, to establish standing in an informational injury context, a plaintiff must demonstrate a *plausible* interpretation of a statute that entitles them to the specific information they seek.  *See Friends of Animals*, 828 F.3d at 992 (informational injury not sufficiently alleged where statutory provision could not be read to require disclosure plaintiffs sought); *see also Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 619 (D.C. Cir. 2006) (informational injury sufficiently alleged where plaintiff offered "at the least a colorable reading of the statute" which entitled them to sought after information). Further, it is not enough for a plaintiff to establish that a statute contains a broad disclosure provision or requires the disclosure of some information generally.  Instead, a plaintiff must demonstrate "a legal right to the information in question," meaning a plausible statutory entitlement to the specific information they seek.  *Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006).

13

B.

The crux of the current dispute, then, is whether Appellants have plausibly demonstrated that the AWA entitles them to inspection reports detailing every instance of AWA noncompliance. Because the Database Provision of the AWA does not plausibly dictate the substance of the publicly required inspection reports, Appellants have failed to demonstrate a legal right to the specific information they seek.

Appellants argue that the AWA entitles them to inspection reports detailing every single instance of AWA noncompliance. To assert a statutory entitlement to these comprehensive inspection reports, Appellants rely on two separate provisions of the AWA, read in tandem. First, Appellants rely on the Database Provision of 7 U.S.C. § 2146a(b)(1), which reads:

> The Animal and Plant Health Inspection Service shall, notwithstanding any other provision of law:
>
> (b) hereafter, make publicly available via searchable database, in their entirety without redactions except signatures, the following records:
>
> (1) all final Animal Welfare Act inspection reports, including all reports documenting all Animal Welfare Act violations and non-compliances **observed by USDA officials** and all animal inventories for the current year and the preceding three years (emphasis supplied);

Second, Appellants rely on the Inspection Provision § 2146(a), which reads in relevant part:

> The Secretary shall make such investigations or inspections as he deems necessary to determine whether any [covered entity] has violated or is violating any provision of this chapter or any regulation

14

or standard issued thereunder, and for such purposes, the Secretary shall, at all reasonable times, have access to the places of business and the facilities, animals, and those records required to be kept pursuant to section 2140 of this title of any such dealer, exhibitor, intermediate handler, carrier, research facility, or operator of an auction sale.

The Secretary shall inspect each research facility at least once each year and, in the case of deficiencies or deviations from the standards promulgated under this chapter, shall conduct such follow-up inspections as may be necessary until all deficiencies or deviations from such standards are corrected.

Appellants' conception of these statutes is that the Inspection Provision requires APHIS to conduct annual investigations in order to uncover *every instance* of AWA noncompliance. *See* Appellants' Opening Br. at 19 ("The AWA envisions those annual inspections would capture all AWA noncompliances."). Therefore, Appellants argue that any inspection policy which fails to identify all AWA noncompliance violates the Inspection Provision. Next, Appellants read the Database Provision's language that inspection reports must document "all [AWA] violations observed by USDA officials" to require inspection reports that document every AWA violation observed by investigators. 7 U.S.C. § 2146a(b)(1). And then Appellants claim that because APHIS investigators must observe *all* AWA violations, their resulting inspection reports must likewise document *all* AWA violations, which must then be disclosed. Therefore, according to Appellants, any inspection policy that results in the failure to document every single instance of AWA noncompliance violates not only the Inspection Provision but also the Database Provision.

Here, because the Focused Inspection Policy prevents APHIS from conducting routine inspections annually, Appellants argue that investigators must be missing instances of AWA noncompliance. "Thus, [Appellants] allege the [Focused] Inspection Policy—

15

and its allowance of the USDA to avoid documentation of all AWA noncompliances and animals at the facility, . . . deprives [Appellants] of information required to be made public." Appellants' Opening Br. at 19.

The USDA responds that Appellants' view of the AWA is implausible. The USDA argues that no conception of either the Inspection Provision or the Database Provision could plausibly require every single instance of AWA noncompliance to be observed and documented. Pursuant to the USDA's view of the Database Provision, Appellants are not statutorily entitled to inspection reports detailing all violations of the AWA. Instead, the USDA argues, the Database Provision imposes only a requirement that APHIS maintain a publicly available database of inspection reports but says nothing about the content of those reports.

The USDA argues that Appellants seek to enforce the substantive requirements of the Inspection Provision by bootstrapping them to their expansive reading of the information entitlement of the Database Provision. But, the USDA argues, even if the Inspection Provision does require inspectors to observe every AWA noncompliance, that provision cannot be read to impose a substantive requirement as to the content of the inspection reports in the separate Database Provision.

C.

Appellants' interpretation of the AWA as requiring publicly available inspection reports which detail *every single instance* of AWA noncompliance is implausible. To determine if Appellants have alleged a plausible statutory entitlement to the specific information they seek, we look to the Database Provision to see what exactly it requires to

16

be disclosed. *See Dreher v. Experian Info. Solutions Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (evaluating which "sources of information" the Fair Credit Reporting Act required to be disclosed to determine the presence of informational injury). Here, the Database Provision requires APHIS to make public "all final AWA inspection reports" and "all animal inventories for the current year and the preceding three years." 7 U.S.C. § 2146a(b)(1). These reports must be "publicly available via searchable database" and be published "in their entirety" and "without redactions." *Id.* at (b). The statute also requires "all reports or other materials documenting any violations and non-compliances observed by USDA officials" and "all final [AWA] research facility annual reports" to be made public. *Id.* at (b)(3)–(4). Importantly, the Database Provision says nothing about the content of the publicly available inspection reports.

Appellants do not allege that the USDA and APHIS are failing to compose or publish final inspection reports publicly. Instead, Appellants merely wish for different, more thorough, inspection reports to be prepared and published. However, nothing in the Database Provision, which is the only provision which entitles Appellants to any information, imposes that requirement.

In an attempt to avoid this reality, Appellants rely on the requirements imposed by the Inspection Provision.

D.

The District of Columbia Circuit considered, and rejected, this same theory in *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entertainment Inc.*, 659 F.3d 13 (D.C.

17

Cir. 2011).[4]  There, the Animal Protection Institute ("API") sued Feld Entertainment Inc. ("Feld"), which owned the largest collection of endangered Asian elephants, alleging that Feld's practice of using bull hooks and tethering to control its elephants violated Section 9 of the Endangered Species Act ("ESA").[5]  Section 9 makes it unlawful to "take" any endangered species within the United States.  The ESA defines to "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or an attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  However, pursuant to ESA section 10, the Secretary of Agriculture may issue a permit for a take otherwise prohibited provided he first gives public notice and an opportunity to comment on the permit application.  16 U.S.C. § 1538(a)(1)(B), (D).

Feld argued that API lacked standing to challenge whether its treatment of elephants constituted a "take" pursuant to section 9.  In response, API asserted informational standing, not under section 9, but pursuant to the public disclosure provision, section 10(c), of the ESA.  Section 10(c) requires public disclosure of information contained in permit

---

[4] *See also Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 957 (7th Cir. 2005) (rejecting the appellants theory that the Appeals Reform Act's procedural rights imbued them with an informational right when violated because it was "too attenuated."); *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1259 (9th Cir. 2010) ("The Appeals Reform Act grants the public a right to process and participation. Even though these rights necessarily, involve the dissemination of information, they are not thereby *tantamount* to a right to information per se." (cleaned up) (emphasis in original)).

[5] A bullhook is a "two- to three-foot rod with a metal point and hook mounted on one end" used to guide and control the elephants.  *Feld Ent.*, 659 F.3d at 17.  Tethering refers to the practice of "tethering the Asian elephants with chains when they are not performing and when they are traveling by train."  *Id.* (cleaned up).

applications for a permissible "take."  Specifically, a party who applies for a permit must provide specified information to the Fish and Wildlife Service which must make that information available to the public.  Recognizing that section 9 did not impose any public disclosure requirements, API sought to tie its challenge to Feld's treatment of elephants to the only ESA provision which entitled them to information -- the public disclosure requirement of section 10(c).

In *Feld*, API argued that sections 9 and 10(c) were so interrelated that section 9 controlled the public disclosure provision of section 10(c), despite not explicitly authorizing the disclosure of information.  According to API, because Feld's treatment of elephants constituted a "take" prohibited by section 9, the company could not lawfully engage in bullhooking and tethering the elephants without first applying for, and obtaining, a permit pursuant to section 10.  This permit application would then be subject to public disclosure.  Therefore, because Feld had not filed a permit application, which API theorized they were required to do, API argued it was being denied information to which it was entitled pursuant to its understanding of the ESA.

The *Feld* court rejected API's informational standing theory, explaining that API's principal disagreement stemmed from a dispute about section 9 in the first instance -- whether Feld's treatment of the elephants constituted a "take" -- rather than about a lack of information which Feld was required to disclose.  The court explained that API would only have standing to bring an informational injury suit pursuant to section 10 if "Feld refused to disclose information in its permit application that API believed the statute required [to be disclosed], or if the Fish and Wildlife Service refused to make public the

19

information it received." *Id.* The *Feld* court further noted that API's requested remedy was a ceasing of the alleged abusive practices, rather than the dissemination of the sought after information. Therefore, because nothing in section 9 entitled API to any information, the court held that the plaintiffs failed to establish informational standing.

Similarly, in *Friends of Animals v. Jewell*, the District of Columbia Circuit again rejected an effort to bootstrap a substantive disagreement with agency policy to a purported informational harm. 828 F.3d 989 (D.C. Cir. 2016). In that case, Friends of Animals, an animal rights organization, sued the USDA pursuant to the ESA alleging that the Secretary had violated section 4 of the ESA. Section 4 of the ESA empowers the Secretary of the Interior ("Interior Secretary") to designate certain species as endangered. The ESA also contains a provision allowing "any interested person to petition the Secretary to add a species or remove it from the endangered or threatened species list." *Id.* at 990. Any petition to list or de-list a species then triggers two mandatory deadlines. The first deadline requires the Interior Secretary to make a finding as to the petition's validity within 90 days of initial receipt of the petition. Second, if the Interior Secretary finds the petition valid, then within 12 months of initial receipt of the petition, the Interior Secretary must make one of three findings: that the listing action requested is (1) not warranted; (2) warranted; or (3) warranted but temporarily precluded by pending proposals to list other species. The Interior Secretary is then required to post the 12 month finding in the Federal Register. Importantly, the ESA also permits "any person to bring suit against the [Interior] Secretary alleging that he has failed to perform a non-discretionary act or duty required by section 4." *Id.* at 991.

20

On September 27, 2013, Friends of Animals filed two listing petitions requesting that the Interior Secretary list the spider tortoise and the flat-tailed tortoise as either threatened or endangered. This filing triggered the 90 day validity determination. However, the Interior Secretary did not make the validity finding within the required 90 day period. Twelve months after the filing of the initial listing petition, in September 2014, the Interior Secretary had still not made a finding as to the listing action. Therefore, Friends of Animals filed an intent to sue letter. In December 2014, the Secretary sent Friends of Animals a letter stating that it did not plan to issue the required 12 month finding for both listing petitions until fiscal year 2017. Friends of Animals then filed a complaint in district court, alleging that the Secretary had violated Section 4 of the ESA by not timely issuing findings within 12 months in response to the listing petitions.

To demonstrate harm, Friends of Animals asserted that it had suffered an informational injury and therefore possessed Article III standing. To support this theory, Friends of Animals asserted that the Interior Secretary's failure to comply with the 12 month deadline deprived them of the information they otherwise would have obtained from the ESA's disclosure provision. Significantly, however, that disclosure provision required the disclosure of information in the Federal Register *only after* the Secretary had released the 12 month finding.

The District of Columbia Circuit Court explained that the 12 month listing provision deadline of section 4 did not entitle Friends of Animals to the requested information. The court explained, "Friends of Animals's contention that it has standing fails at the first part of the inquiry, the *sine qua non* of informational injury: It is seeking to enforce a statutory

21

deadline provision that by its terms does not require the public disclosure of information." *Friends of Animals*, 828 F.3d at 992.  Therefore, because the Friends of Animals complaint sought to have the court order compliance with the *deadline* requirement and not the *disclosure* requirement of the ESA, the court held that an informational injury had not been alleged.  This was true despite the alleged interconnectedness of the provisions and the downstream consequences of disclosure that would result from compliance with the deadline provision.  Therefore, "because Friends of Animals [sought] to enforce a deadline requirement that does not obligate the Secretary to disclose information" they did not sufficiently establish Article III standing.  *Id.* at 994–95.

E.

Here, we likewise reject Appellants' attempt to recast a dispute in connection with the Focused Inspection Policy as an informational harm.  Appellants are receiving the inspection reports to which the AWA's Database Provision entitles them.  They are not entitled to more.

Appellants contend that, absent the Focused Inspection Policy, APHIS "would necessarily be collecting more information that would have to be reported to the public about whether research facilities are complying with all AWA standards—precisely the kind of injury the Supreme Court upheld in *Federal Election Commission v. Akins*, 524 U.S. 11 (1998)."  Appellants' Opening Br. at 21.  In *Akins*, a group of voters sued the Federal Election Commission ("FEC") over its determination that the American Israel Public Affairs Committee ("AIPAC") was not a "political committee" as defined by the Federal Election Campaign Act of 1971 ("FECA").  524 U.S. at 16.  The FECA "imposes

22

extensive recordkeeping and disclosure requirements upon groups that fall within the [FECA's] designation of a political committee." *Id.* at 14 (internal quotation marks omitted). Because AIPAC was not designated a political committee, it was not required to make these disclosures. The FECA provided that "any person who believes a violation of this Act has occurred, may file a complaint with the [FEC]." *Id.* at 19. The FECA further provided that "any party aggrieved by an order of the [FEC] dismissing a complaint filed by such party may file a petition in district court seeking review of that dismissal." *Id.* In *Akins*, the respondents, a group of voters, filed an administrative complaint based on the failure of the FEC to designate AIPAC as a political committee and sought review of that complaint's dismissal in district court.

The respondents alleged that pursuant to the FECA, AIPAC was a political committee and should be designated as such. The respondents alleged that this incorrect designation caused an informational injury because they could not obtain the disclosure information from AIPAC that would otherwise result from a political committee designation. The FEC argued that respondents lacked standing to challenge the FEC's political committee designation because the respondents alleged only a generalized grievance in the designation. The Supreme Court disagreed, holding that the FECA's designation challenge provisions explicitly sought to address "the failure to obtain relevant information" from a designation decision. *Akins*, 524 U.S. at 20. The Court explained, "the 'injury in fact' that respondents have suffered consists of their inability to obtain information . . . that on respondents' view of the law, the statute requires that AIPAC make

23

public." *Id.* at 21.    Therefore, the respondents' injury was sufficiently concrete and particular to meet the requirements of Article III standing.

Appellants attempt to analogize *Akins* to the case at hand arguing that *Akins* demonstrates a viable injury exists in the "conveyance of less accurate or fulsome information."    Appellants' Opening Br. at 21.    But, "in relying on *Akins*, Appellants confuse two distinct standing inquiries: the concreteness of the alleged injury and the status of the claimed right." *Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006).    The question in *Akins* was whether the respondents' challenge to AIPAC's political designation was too generalized to confer informational standing.    The *Akins* court concluded that it was not, holding that an informational injury could be "sufficiently concrete and specific" to confer standing.    *Akins* did not address whether the FECA granted a right to the information at issue.    And that makes all the difference because that is the question we face here.

Significantly, this case deals with "the antecedent question [of] whether Congress has granted a legal right to the information in question." *Salt Inst.*, 440 F.3d at 159.    And *Akins* is of no moment in determining whether Appellants have plausibly alleged a statutory entitlement to the information they seek.    Here, Appellants must demonstrate that the AWA Database Provision plausibly entitles them to inspection reports detailing every instance of AWA noncompliance.    Appellants have not done so.    Appellants have not plausibly alleged that the Database Provision requires the inspection reports to contain *any* specific content, let alone that it requires a detailing of every instance of AWA noncompliance.    Therefore, Appellants have not plausibly demonstrated a denial of any information to which they are statutorily entitled.    Thus, the Database Provision does not provide Appellants with a

24

vehicle to challenge APHIS' substantive inspection practice, and they have not demonstrated an informational injury sufficient to confer standing.

IV.

For the foregoing reasons, the district court's dismissal for lack of subject matter jurisdiction is

*AFFIRMED*.